**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
VOX AMPLIFICATION LTD, KORG INC. and
KORG USA, INC.,

               Plaintiffs/Counterclaim-Defendants,     **MEMORANDUM OF**
                                            **DECISION AND ORDER**
               -against-                     13-CV-4922 (ADS)(GRB)

JACK CHARLES MEUSSDORFFER and
PHANTOM GUITAR WORKS INC. a/k/a
PHANTOM GUITAR WORKS,

               Defendants/Counterclaim-Plaintiffs.
----------------------------------------------------------X

<u>**APPEARANCES:**</u>

**Drinker Biddle & Reath LLP**
*Attorneys for the Plaintiffs and Counterclaim-Defendants*
1177 Avenue of the Americas, 41st Floor
New York, NY 10036
    By:   Marsha J. Indych, Esq.
           Brian A. Coleman, Esq., Of Counsel

**Bienstock & Michael PC**
*Attorneys for the Defendants and Counterclaim-Plaintiffs*
411 Hackensack Avenue, 7th Floor
Hackensack, NJ 07601
    By:   Ronald S. Bienstock, Esq.
           Brent Merrill Davis, Esq., Of Counsel

**SPATT, District Judge**.

      On September 3, 2013 the Plaintiffs and Counterclaim-Defendants Vox Amplification

Ltd, Korg Inc. and Korg USA, Inc. (the "Plaintiffs"), commenced this action against the

Defendants and Counterclaim-Plaintiffs Jack Charles Meussdorffer ("Meussdorffer") and

Phantom Guitar Works, Inc., also known as Phantom Guitar Works ("PGW," and collectively,

the "Defendants"). The Plaintiffs seek (1) a declaratory judgment at to [the] Plaintiffs' non-

infringement of [the] Defendants' claimed trademark rights in the terms 'Phantom' and

'Teardrop' and in the 'Phantom' and 'Teardrop' guitar body styles; [and] (2) cancellation of [the] Defendant Meussdorffer's federal trademark registrations for these same word marks and guitar designs[.]" (Compl., ¶ 1.) The Plaintiffs also assert a claim for "tortious interference with [the] Plaintiffs' supply network and unfair competition with [the] Plaintiffs based on [the] Defendants' threats of suit and assertions of trademark infringement, despite the Defendants' awareness of its lack of enforceable rights and inability to prove infringement." (Compl., ¶ 1.)

On October 15, 2013, the Defendants filed an Answer and Counterclaim against the Plaintiffs. The next day, October 16, 2013, the Defendants moved for a preliminary injunction pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 65 and the Lanham Act, 15 U.S.C. § 1501, et seq., enjoining the Plaintiffs from the Defendants' four federally registered trademarks, particularly in connection with the marketing, advertising, distributing or selling of musical instruments. On October 25, 2013, the Court referred the matter to United States Magistrate Judge Gary R. Brown for the purpose, if necessary, of holding a hearing and issuing a Report and Recommendation addressing the Defendants' motion for a preliminary injunction.

Thereafter, on November 8, 2013, the Plaintiffs moved to dismiss the Defendants' Counterclaim pursuant to Fed. R. Civ. P. 12(b)(6). In response, on November 18, 2013, the Defendants filed a First Amended Counterclaim, thereby rendering the Plaintiffs' November 8, 2013 motion moot. However, on December 5, 2013, the Plaintiffs moved to dismiss the Defendants' First Amended Counterclaim, alleging that it was still legally insufficient under Fed. R. Civ. P. 12(b)(6). The First Amended Counterclaim asserts causes of action for (1) trademark infringement pursuant to 15 U.S.C. § 1114; (2) false designation of origin and unfair competition pursuant to 15 U.S.C. § 1125(A); (3) common law trademark infringement pursuant to New York State law; and (4) common law unfair competition pursuant to New York State law.

On February 11, 2014, Judge Brown issued a Report and Recommendation (the "R&R"), in which he recommended that the Defendants' motion for a preliminary injunction be granted as to the Plaintiffs' allege use of the Defendants' incontestable registered Phantom trademarks, but denied as to the Defendants' claims emanating from the Teardrop guitar body design and Teardrop word mark, as applied to electric guitars. Judge Brown also recommended that the Court deny any claim concerning the Plaintiffs' production of electric ukuleles, which the Defendants' had alleged infringed on the Teardrop trademarks.

On February 25, 2014, the Plaintiffs filed written objections to the R&R only with respect to Judge Brown's recommendation concerning the Phantom trademarks. The Defendants oppose the Plaintiffs' objections and argue that the R&R should be adopted in its entirety.

Thus, presently before the Court is the R&R, which the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C)." Also before the Court is the Plaintiffs' motion to dismiss the First Amended Counterclaim, as well as a motion by the Plaintiffs' to supplement the preliminary injunction record with a consumer survey that was completed after Judge Brown issued the R&R.

For the reasons set forth below, the Court denies the Plaintiffs' motion to dismiss; denies the Plaintiffs' motion to supplement the preliminary injunction record; and overrules the Plaintiffs' objections and adopts the R&R in its entirety.

## I. BACKGROUND

Beginning in late 1961, a United Kingdom company known as Jennings Musical Industries ("JMI") began producing and selling guitars in the United Kingdom under the "Vox" brand name and with "Phantom" as the model designation. These guitars were unique due to

their rounded trapezoidal body shape. In 1963, JMI began manufacturing and selling guitars in the United Kingdom that had a rounded body shape, similar to a teardrop, under the "Vox" brand name and using "Phantom III" and "Phantom IV" as their model designations. JMI began manufacturing these guitars for the United States market, but it appears that the parties do not provide further details as to when JMI started to do so.

In any event, in 1963, JMI stopped producing the above guitars for the United States market. Rather, on behalf of JMI, from 1963 to 1969, an Italian company called EKO manufactured these guitars for the United States market, but the guitars sold in very limited quantities during this period. In 1969, JMI ceased manufacturing all guitars, thus abandoning any trademark rights it may have had to either the guitar's model names or body shapes.

At some point about the early 1990s, the Defendant Meussdorffer, who is a luthier, or maker of stringed instruments, decided to manufacture, market and sell guitars in similar shapes as those produced by JMI and EKO in the 1960s. Thus, in 1993, Meussdorffer formed the Defendant PGW, which started producing guitars and basses with model designations of Phantom and Teardrop. PGW's Phantom guitars had a rounded trapezoidal body shape with a rounded shaped headstock (the "Phantom Body Shape"), while the Teardrop guitars had a teardrop body shape with a rounded shaped headstock (the "Teardrop Body Shape"). PGW has continued to sell Phantom guitars and Teardrop guitars without interruption from 1993.

According to the Defendants, since 1993, they have policed their marks in connection with the Phantom guitars and Teardrop guitars. In this regard, the Defendants claim the following four marks: (1) a mark for the word "Phantom"; (2) a mark for the word "Teardrop"; (3) a mark for the Phantom Body Shape; and (4) a mark for the Teardrop Body Shape.

The Defendants have licensed these marks to various companies, including EKO, which was one of the original manufacturers of the Vox guitars in the 1960s, as well as Roland Corporation, which is one of the Plaintiffs' main competitors. In addition, the Defendants claim to have developed significant goodwill over the last twenty years in connection with these marks. In this regard, they claim that famous musicians, such as the lead singer of the band Coldplay, the guitarist for Bruce Springsteen and the E Street Band, and the guitarist for The Cars, have used the Defendants' products bearing their marks.

Also in 1993, the Plaintiffs revived the Vox brand in International Class 009 and started to sell guitar amplifiers. That same year, the Plaintiffs and the Defendants participated as exhibitors at the 1993 NAMM show, which is North America's largest musical instrument trade show. During the show, the Plaintiffs borrowed the Defendants Phantom and Teardrop guitars so that attendees of the show could try the new Vox branded guitar amplifiers. Following the NAMM show, the Plaintiffs reached out to the Defendants about possibly manufacturing guitars for the Plaintiffs. However, no agreement ever materialized from the parties' negotiations.

On April 1, 1994, the Defendants applied to the United States Patent and Trademark Office ("USPTO") for trademark registration of the standard character word mark "Teardrop," and on January 11, 1996, the Defendants applied to the USPTO for trademark registration of the standard character word mark "Phantom." Thereafter, on February 13, 1996, the USPTO granted word mark registration for "Teardrop," and on December 29, 1996, the USPTO granted word mark registration for "Phantom."

In 1998, the Plaintiffs issued a small amount of guitars using body shapes that were similar to the Defendants' Phantom Body Shape and Teardrop Body Shape (the "1998 guitars"). In response, the Defendants sent the Plaintiffs a cease and desist letter concerning the alleged

infringement.  However, it seems that none of the 1998 guitars were ever sold in the United States and the Plaintiffs stopped selling them.

On December 26, 2001, the Defendants applied to the USPTO for trademark registration for the Phantom Body Shape and the Teardrop Body Shape.  On September 30, 2003, the USPTO granted registration for the Teardrop Body Shape.  On October 5, 2004, the USPTO granted registration for the Phantom Body Shape.

In 2007, the Plaintiffs decided to issue one hundred guitars with body shapes nearly identical to the Defendants' Phantom Body Shape and Teardrop Body Shape (the "2007 guitars").  In response, the Defendants sent the Plaintiffs a cease and desist letter.  Ultimately, the Plaintiffs made less than seventy of the 2007 guitars and only a small portion of these guitars were sold in the United States.

Five years later, in 2012, the Plaintiffs again began manufacturing and selling guitars and bases with designs substantially matching the Defendants' Phantom Body Shape mark and Teardrop Body Shape mark.  The Plaintiffs used the model designation "Apache" for these instruments (the "2012 Apache instruments"), with those instruments utilizing the Phantom Body Shape called Apache II (the "Apache II guitars") and those instruments utilizing the Teardrop Body Shape called Apache I (the "Apache I guitars").  Once more, the Defendants sent the Plaintiffs a cease and desist letter.  The Defendants also apparently received inquiries from customers who believed that the Defendants were producing and selling the 2012 Apache instruments.

For two years, the Plaintiffs and the Defendants engaged in discussions over the Defendants manufacturing guitars for the Plaintiffs and the Plaintiffs licensing the Defendants' marks.  However, in 2013, the Plaintiffs began making a ukulele under the model designation

"Ukelectric" that had a body shape similar to the Defendants' Teardrop Body Shape mark (the "2013 ukuleles"). Thus, the Defendants again sent the Plaintiffs a cease and desist letter. At this point, the Plaintiffs commenced the instant action.

## II. THE PLAINTIFFS' MOTION TO DISMISS THE FIRST AMENDED COUNTERCLAIM

Before considering the Defendants' motion for a preliminary injunction and the related R&R, the Court will first look at whether the Defendants' First Amended Counterclaim, upon which its motion for preliminary injunction relies, can survive the Plaintiffs' Fed. R. Civ. P. 12(b)(6) motion to dismiss.

## A. Legal Standard on a Fed. R. Civ. P. 12(b)(6) Motion to Dismiss

It is well-established that a complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). In this regard, as suggested above, when deciding a motion to dismiss, a court is required to accept the material facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Iqbal, 556 U.S. at 678; Zinermon v. Burch, 494 U.S. 113, 118, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990); In re NYSE Specialists Secs. Litig., 503 F.3d 89, 91 (2d Cir. 2007).

As such, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and . . . determine whether they plausibly give rise to an entitlement of relief." Iqbal, 556 U.S. at 679. However, "although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" Harris v. 301 Mills, 572 F.3d 66, 72 (2d Cir.2009) (quoting Iqbal, 556 U.S. at 678).

**B. As to the Plaintiffs' Motion to Dismiss the Defendants' Counterclaims**

As stated above, the Defendants in this case have filed a Counterclaim alleging (1) trademark infringement pursuant to 15 U.S.C. § 1114; (2) false designation of origin and unfair competition pursuant to 15 U.S.C. § 1125(A); (3) common law trademark infringement pursuant to New York State law; and (4) common law unfair competition pursuant to New York State law. The Plaintiffs attack the sufficiency of the First Amended Counterclaim by making the following arguments: (1) that the Counterclaim is barred by laches; (2) with respect to the trademark infringement claims, the Defendants failed to adequately plead infringing use or likelihood of confusion; (3) the Defendants have failed to plead the required elements of an unregistered trade dress claim with respect to the Plaintiffs' 1998 guitars; and (4) the Defendants have failed to state a claim for unfair competition.

At the outset, the Court notes that the Plaintiffs' argument that the Defendants have failed to plead the required elements of an unregistered trade dress claim with respect to the 1998 guitars is without merit, since the Defendants have asserted no such claim. As such, the Court need not consider this issue any further. Concerning the Plaintiffs' remaining contentions, as discussed in more detail below, on the merits, the Court is unpersuaded and, therefore, denies the Plaintiffs' motion to dismiss the Counterclaim.

**1. The Doctrine of Laches**

Concerning their laches argument, the Plaintiffs contend that the Defendants' Counterclaim consists of claims involving a fifteen-year old dispute over the Plaintiffs' alleged illegal use of the Defendants' Phantom marks and Teardrop marks. As such, according to the Plaintiffs, these claims are presumptively barred by laches. The Defendants counter that, despite

the Plaintiffs' assertions to the contrary, they are not seeking relief for the Plaintiffs' conduct related to the 1998 guitars or 2007 guitars, but rather only bring claims related to the Plaintiffs' 2012 Apache instruments and 2013 ukuleles.

The defense of laches is a "question primarily addressed to the discretion of the trial court which must consider the equities of the parties." Gardner v. Panama R.R. Co., 342 U.S. 29, 30, 31, 72 S. Ct. 12, 13, 96 L. Ed. 31 (1951) (per curiam). "[Laches] is an equitable defense that bars a [party's] equitable claim when he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the [opposing party]." Ikelionwu v. U.S., 150 F.3d 233, 237 (2d Cir. 1998) (internal quotations and citations omitted).

Of importance, "[l]aches is an affirmative defense and is generally not available on a motion to dismiss." George Nelson Found. v. Modernica, Inc., CIV.A. 13-3427, 2014 WL 1408631, at *16 (S.D.N.Y. Mar. 12, 2014) (Lennon v. Seaman, 63 F. Supp. 2d 428, 439 (S.D.N.Y.1999)). Indeed, courts have "declined to rule on the question of laches at the motion to dismiss stage because 'laches would necessarily involve a fact-intensive analysis and balancing of equities that would require the Court to consider matters outside of the pleadings that are in dispute.'" Id. at *17 (quoting Lennon, 63 F. Supp. 2d at 439). Nevertheless, "in certain circumstances, when the defense of laches is clear on the face of the complaint, and where it is clear that the [party bringing the claim] can prove no set of facts to avoid the insuperable bar, a court may consider the defense on a motion to dismiss." Id. at *16 (quoting Lennon, 63 F. Supp. 2d at 439).

"To prevail on a defense of laches in the trademark context, a [party] must establish that (1) the [opposing party] had knowledge of the [party's] use of its marks; (2) the [opposing party] inexcusably delayed taking action against the [party]; and (3) the [party] will be prejudiced by

permitting [the opposing party] to assert its rights now." Societe Des Bains De Mer Et Du Cercle Des Etrangers a Monaco v. MGM Mirage, 08CV03157(HB), 2008 WL 4974800, at *5 (S.D.N.Y. Nov. 24, 2008) (citing Fourth Toro Family Ltd. Partnership v. PV Bakery, Inc., 88 F. Supp. 2d 188, 196 (S.D.N.Y. 2000)).

In addition, because "[t]he Lanham Act establishes no statutory time bar, . . . the Second Circuit applies New York's six-year fraud statute of limitations to Lanham Act claims to determine which party bears the burden of proof with respect to the laches defense." Id. (citing Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 191 (2d Cir. 1996)). In this regard, "the Second Circuit has held that in a dispute under the Lanham Act, a delay in excess of six years raises a presumption of laches" and that "[o]nce [this] presumption arises, the burden shifts to [the opposing party] to come forward with evidence to establish that the delay was excusable and that [the party against which the claim is raised] suffered no prejudice from the delay." Haggar Int'l Corp. v. United Co. for Food Indus. Corp., 906 F. Supp. 2d 96, 135 (E.D.N.Y. 2012) (citing Conopco, Inc., 95 F. 3d at 191).

The Court finds that the Plaintiffs cannot defeat the Defendants' Counterclaim based on the doctrine of laches. While the Court recognizes that there has been a dispute between the Plaintiffs and the Defendants over the Defendants' Phantom marks and Teardrop marks since the Plaintiff's production of the 1998 guitars, the Counterclaim indicates that the Defendants consistently policed their marks by promptly sending cease and desist letters to the Plaintiffs. Moreover, with the exception of the 2012 Apache instruments and 2013 ukuleles, the Plaintiffs stopped manufacturing the allegedly infringing instruments shortly after receiving the said cease and desist letters.

Thus, these cease and desist letters eliminate any claim the Plaintiffs would have to the affirmative defense of laches. See, e.g., Fendi Adele S.R.L. v. Ashley Reed Trading, Inc., 06 CIV. 243 (RMBMHD), 2010 WL 571804, at *9 (S.D.N.Y. Feb. 16, 2010) (collecting cases) (finding that the plaintiffs were entitled to summary judgment as to the defendants' affirmative defense of laches where the plaintiffs sent a cease and desist letter to the defendants and the parties engaged in subsequent meetings through their attorneys, thereby putting the "[d]efendants [ ] clearly on notice of [the] [p]laintiffs' objections to [the defendants' allegedly infringing activities]"); see also Fendi Adele S.R.L. v. Filene's Basement, Inc., 696 F. Supp. 2d 368, 380 (S.D.N.Y. 2010) (same). Further, even if a presumption of laches applied in this case, the factual allegations in the Counterclaim would rebut the presumption, since the Defendants assert that, starting in 2012, they engaged in lengthy discussions with the Plaintiffs about the Phantom marks and Teardrop marks. See, e.g., Pecorino v. Vutec Corp., 11-CV-6312 PKC, 2013 WL 4807113, at *5 (E.D.N.Y. Sept. 9, 2013) ("[The] [p]laintiffs [bringing a patent infringement claim] could rebut the presumption of laches with evidence that . . . they were involved in negotiations with the accused infringer.").

In any event, the Plaintiffs overlook the fact that the Defendants' Counterclaim clearly alleges that the purported infringing acts of the Plaintiffs were intentional. "Intentional infringement is a dispositive, threshold inquiry that bars further consideration of the laches defense, not a mere factor to be weighed in balancing the equities." Societe Des Bains, 2008 WL 4974800, at *6 (S.D.N.Y. Nov. 24, 2008) (quoting Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000)). Accordingly, in light of this factual allegation by the Defendants, it would be inappropriate for the Court to dismiss the Defendants' Counterclaim pursuant to Fed. R. Civ. P. 12(b)(6).

## 2. As to the Sufficiency of the Defendants' Trademark Infringement Claims

The Plaintiffs also take issue with the sufficiency of the Defendants' trademark infringement claims, and argue that the Defendants failed to adequately plead infringing use as to the Defendants' word marks or likelihood of confusion as to all of the Defendants' marks. The Court disagrees.

As an initial matter, Courts employ substantially similar standards when analyzing claims for trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1)(a); false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a); trademark infringement under New York common law; and unfair competition under New York common law. See Richemont North America, Inc. v. Huang, No. 12 Civ. 4443(KBF), 2013 WL 5345814, at *5 n.15 (S.D.N.Y. Sept. 24, 2013).

In this regard, "[t]o prevail on an infringement action [under the Lanham Act, 15 U.S.C. § 1114(1)(a) ], a [party] must demonstrate: (1) 'that it has a valid mark entitled to protection,' and (2) 'that the [opposing party's] use of that mark is likely to cause confusion." Juicy Couture v. Bella Intern. Ltd., 930 F. Supp. 2d, 489, 498 (S.D.N.Y. 2013) (quoting Time, Inc. v. Petersen Publ'g Co. LLC, 173 F.3d 113, 117 (2d Cir. 1999)). With respect to determining whether the use of a mark by an allegedly infringing party will cause confusion,

> [c]ourts look to the following factors . . . : (1) the strength of the [party's] mark; (2) the similarity of the marks; (3) the competitive proximity of the products in the marketplace; (4) the likelihood that the senior user will "bridge the gap" by moving into the junior's product market; (5) evidence of actual confusion; (6) the junior user's bad faith in adopting the mark; (7) the respective quality of the products; and (8) the sophistication of the consumers in the relevant market.

Id. at 499 (citing Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961)). These factors are referred to by courts as the "Polaroid factors," based on the Second Circuit case Polaroid Corp. v. Plarad Elecs. Corp., 287 F.2d at 495, from which they derive.

As to a federal claim of false designation of origin, which is also referred to as a claim for unfair competition, the Lanham Act, 15 U.S.C. § 1125(a), "prohibits any misrepresentation likely to cause confusion about the source of a product, in particularly the use by any person of [ ] any . . . name . . . likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association . . . with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." L'Oreal USA, Inc. v. Trend Beauty Corp., No. 11 Civ. 4187(PA), 2013 WL 4400532, at *14 (S.D.N.Y. Aug. 15, 2013) (quoting 15 U.S.C. § 1125(a)) (third ellipse in the original). "[T]he standards for false designation of origin claims under Section 43(a) of the Lanham Act (15 U.S.C. § 1125) are the same as for trademark infringement claims under Section 32 (15 U.S.C. § 1114)." Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc., 220 F. Supp. 2d 289, 297 (S.D.N.Y. 2002); see also Estate of Ellington ex rel. Ellington v. Harbrew Imports Ltd., 812 F. Supp. 2d 186, 192 (E.D.N.Y. 2011) ("A party establishes liability under [15 U.S.C. § 1125(a) ] if it can demonstrate (1) that it has a valid trademark entitled to protection under the Act, and (2) defendant's actions are likely to cause confusion.") (citations and quotation marks omitted).

Of importance, while 15 U.S.C. § 1114 "protects registered trademarks[,]" 15 U.S.C. § 1125(a) "is a broad federal unfair competition provision which protects unregistered trademarks[.]" L'Oreal USA, 2013 WL 4400532, at *14. In this regard, "[a]n unregistered mark . . . can be protected under the Lanham Act if it would qualify for registration as a trademark." Lopez v. Gap, Inc., 883 F. Supp. 2d 400, 414 (S.D.N.Y. 2012) (citing Courtenay Commc'ns

Corp. v. Hall, 334 F.3d 210, 213 n.2 (2d Cir. 2003)).  To qualify for trademark registration, a mark must be "either [ ] (1) 'inherently distinctive,' where its intrinsic nature serves to identify its particular source; or (2) distinctive by virtue of having acquired a 'secondary meaning' in the minds of consumers."  Id. (quoting Artisan Mfg. Corp. v. All Granite & Marble Corp., 559 F. Supp. 2d 442, 449 (S.D.N.Y. 2008)).  It "must also be 'used in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark'" and "must have been used in commerce, not merely adopted by the plaintiff."  Id. at 414–15 (quoting Gameologist Grp., LLC v. Scientific Games Int'l, Inc., 838 F. Supp. 2d 141, 154 (S.D.N.Y.2011)) (emphasis removed).

Lastly, as suggested above, "[i]t is well-established that the elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law mirror the Lanham Act claims."  Allied Interstate LLC v. Kimmel & Silverman P.C., 2013 WL 4245987, at *5 (S.D.N.Y. Aug. 12, 2013) (quoting Lorillard Tobacco Co. v. Jamelis Grocery, Inc., 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005)).  However, "[a] claim for unfair competition under New York common law requires the [party bringing the claim] to satisfy an additional element and show that the [opposing party's] conduct was in bad faith."  Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC, 08-CV-442 TPG FM, 2014 WL 4723299, at *2 (S.D.N.Y. Sept. 23, 2014) (citing Lorillard, 378 F. Supp. 2d at 456)).

Here, in their Counterclaim, the Defendants pled ownership of four federally registered trademarks, as follows: (1) the Phantom word mark; (2) the Phantom Body Shape mark; (3) the Teardrop word mark; and (4) the Teardrop Body Shape mark.  According to the Defendants, the Plaintiffs' 2012 Apache instruments and 2013 ukuleles had nearly identical body shapes as those protected by the Defendants' Phantom Body Shape mark and Teardrop Body Shape mark.

Moreover, as to the Phantom word mark and Teardrop word mark, the Defendants assert that in marketing the 2012 Apache instruments and 2013 ukuleles, the Plaintiffs used these marks in their advertising.

Despite the Plaintiffs' arguments to the contrary, in the Court's view, the Defendants have met their pleading requirements for their trademark infringement claims. First, the Defendants have adequately pled infringing use of the Defendants' word marks by the Plaintiffs. In this regard, the Plaintiffs incorrectly posit that the Defendants are required to assert in their Counterclaim that the Plaintiffs used the word marks as a mark and/or brand. However, the Second Circuit has never "adopt[ed] the rule that Lanham Act plaintiffs must show that the defendant was using the allegedly infringing content 'as a mark' as a threshold issue in order to establish consumer confusion." Kelly-Brown v. Winfrey, 717 F.3d 295, 308 (2d Cir. 2013). Rather, a court "should ask whether the trademark has been displayed to consumers in connection with a commercial transaction." Id. at 306. Obviously, in this case, if the Plaintiffs were using the Defendants' word marks as part of their advertising for the 2012 Apache instruments and 2013 ukuleles, then they would have been displaying the Defendants' word marks to consumers in connection with a commercial transaction—that is, the sale of musical instruments.

Second, the Plaintiffs' use of the Defendants' marks in the production and marketing of stringed musical instruments would likely cause consumer confusion with the Phantom and Teardrop products sold by the Defendants. Of relevance here, "[l]ikelihood of confusion requires that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question, or are likely to believe that the mark's owner sponsored, endorsed, or otherwise approved of the defendant's use of the mark[.]"

Merck & Co. v. Mediplan Health Consulting, Inc., 425 F. Supp. 2d 402, 411 (S.D.N.Y. 2006) (citations and internal quotation marks omitted).  In this case, both the Plaintiffs and the Defendants are offering stringed musical instruments, such as guitars and basses, to the public for sale.  By utilizing body shapes and words that are similar to the Defendants' Body Shape marks and word marks, the Plaintiffs' 2012 Apache instruments and 2013 ukuleles can easily be mistaken by ordinary prudent consumers for the Phantom guitars and the Teardrop guitars sold by the Defendants.

The Court acknowledges that it is possible, as the Plaintiffs contend, that because both the Defendants' products and the Plaintiffs' products derive from the 1960s designs, consumers might be more likely to confuse the 2012 Apache instruments and 2013 ukuleles with the original instruments offered in the 1960s offerings instead of with the Defendants' Phantom guitars and Teardrop guitars.  However, at this stage, the Court declines to further consider the Plaintiffs' arguments regarding likelihood of confusion.  This is because "[l]ikelihood of confusion is a fact-intensive analysis that ordinarily does not lend itself to a motion to dismiss." The Name LLC v. Arias, No. 10 Civ. 3212(RMB), 2010 WL 4642456, at *5 (S.D.N.Y. Nov. 16, 2010) (quoting Merck & Co., Inc. v. Mediplan Health Consulting, Inc., 425 F. Supp. 2d 402, 412 (S.D.N.Y. 2006) (in turn, citing Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998))); see also Peek & Cloppenburg KG v. Revue, LLC, No. 11 Civ. 5967(DAB), 2012 WL 4470556, at *5 (S.D.N.Y. Sept. 19, 2012) (quoting DC Comics Inc. v. Reel Fantasy, Inc., 696 F.2d 24, 26 (2d Cir. 1982) ("[A] likelihood of confusion is a question of fact as to the probable or actual actions and reactions of prospective purchasers of the goods or services of the parties.")); Ritani, LLC v. Aghjayan, 880 F. Supp. 2d 425, 446 (S.D.N.Y. 2012) (collecting cases).

In sum, the Defendants have properly stated their claims for trademark infringement and the Plaintiffs' Rule 12(b)(6) motion to dismiss the Counterclaim on the above grounds is denied.

### 3. As to the Sufficiency of the Defendants' Common Law Unfair Competition Claim

The Plaintiffs further challenge the adequacy of the Defendants' fourth cause of action, which is for unfair competition pursuant to New York State common law, on the ground that the Defendants have not pleaded bad faith. Again, the Court disagrees.

According to the Counterclaim, the Plaintiffs were aware of the Defendants' ownership of the Phantom marks and Teardrop marks, but yet moved ahead with allegedly using the Defendants' marks in the manufacturing, advertising and selling of the 2012 Apache Instruments and the 2013 ukuleles. In the Court's view, these factual allegations are sufficient to allow the Defendants' common law unfair competition claim to survive the Plaintiffs' Fed. R. Civ. P. 12(b)(6) motion to dismiss. See Peek & Cloppenburg KG v. Revue, LLC, 11 CIV. 5967 DAB, 2012 WL 4470556, at *6 (S.D.N.Y. Sept. 19, 2012) (citing United States Polo Ass'n, Inc. v. PRL USA Holdings, Inc., 800 F.Supp.2d 515, 536 (S.D.N.Y. 2011); Pearson Educ., Inc. v. Kumar, 721 F. Supp. 2d 166, 192 (S.D.N.Y.2010)) ("Bad faith can be found when the junior user has prior knowledge of the senior's mark and the marks are so close as to infer copying. And, allegations of willful conduct or conscious awareness may be sufficient.").

### III. THE PLAINTIFFS' MOTION TO SUPPLMENT THE PRELIMINARY INJUNCTION RECORD

The Court will next consider the Plaintiffs' request that the preliminary injunction record be supplemented so that the Court can review a consumer survey that the Plaintiffs now offer as evidence in support of its objections to the R&R and its position that the Defendants' motion for a preliminary injunction should not be denied in its entirety.

"A district court conducting a de novo review of a magistrate judge's report and recommendation is permitted, but not required, to supplement the record by entertaining additional evidence." E.F. ex rel. N.R. v. New York City Dep't of Educ., 11 CIV. 5243 GBD FM, 2014 WL 1092847, at *5 (S.D.N.Y. Mar. 17, 2014). Nevertheless, "[a]bsent a most compelling reason, the submission of new evidence in conjunction with objections to the Report and Recommendation should not be permitted." Id. (quoting Hous. Works, Inc. v. Turner, 362 F. Supp. 2d 434, 438 (S.D.N.Y. 2005)) (alterations in original).

Here, the Plaintiffs attempt to introduce a consumer survey that they claim demonstrates that no consumer confusion exists between the Apache II guitars and the Defendants' Phantom guitars. According to the Plaintiffs, they could not prepare this survey prior to the November deadline to submit as evidence to Judge Brown concerning the Defendants' preliminary injunction motion. Indeed, the Plaintiffs claim that the survey was not completed until after Judge Brown issued the R&R.

However, the Court agrees with the Defendants that the Plaintiffs have failed to present any evidence beyond the self-serving claims in their memorandum of law that the survey could not have been completed and presented to Judge Brown before he issued the R&R. In fact, the declaration of Kenneth Hollander, who conducted the survey, provides no indication of when the survey took place or how long it took him to prepare for it, conduct it and analyze the results. Hence, without this information, the Court has no way of determining that it was not possible for the Defendants to present the survey sooner. For this reason, in its discretion, the Court denies the Plaintiffs' motion to supplement the preliminary injunction record.

## IV. THE PLAINTIFFS' OBJECTIONS TO THE R&R AND THE DEFENDANTS' MOTION FOR A PRELIMINARY INJUNCTION

As an initial matter, the Court notes that neither party objects to Judge Brown's recommendations with respect to the Defendants' Teardrop trademarks or the Plaintiff's production of electric ukuleles. "To accept the report and recommendation of a magistrate, to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record." Wilds v. United Parcel Serv., 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003) (citing Nelson v. Smith, 618 F. Supp. 1186, 1189 (S.D.N.Y.1985)). The Court has reviewed these recommendations and finds them to be persuasive and without any legal or factual errors. Accordingly, the Court adopts these recommendations in their entirety and denies the Defendants request for injunctive relief as to the Teardrop Trademarks and the 2013 ukuleles.

The Court will now proceed to consider Judge Brown's recommendation concerning the Defendants' Phantom word mark and Phantom Body Shape mark (collectively, the "Phantom marks"), to which the Plaintiffs object.

## A. Legal Standard for Reviewing a Magistrate Judge's Report and Recommendation

A court is required to make a de novo determination as to those portions of the Report and Recommendation to which objections were made. 28 U.S.C. § 636(b)(1)(C); Grassia v. Scully, 892 F.2d 16, 19 (2d Cir. 1989). The phrase "de novo determination" in Section 636(b)(1)—as opposed to "de novo hearing"—was selected by Congress "to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations." United States v. Raddatz, 447 U.S. 667, 676, 100 S. Ct. 2406, 65 L. Ed. 2d 424 (1980). Section 636 does not require a court "to rehear the contested testimony in order to carry out the statutory command to make the required 'determination.'" Id. at 674. Rather, in making such a determination, a court may in its

discretion review the record and hear oral argument on the matter.  See Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters, 894 F.2d 36, 40 n.3 (2d Cir. 1990). Furthermore, a court may in its sound discretion, afford a degree of deference to the magistrate's Report and Recommendation.  See Raddatz, 447 U.S. at 676.

In a case where a party "makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." Pall Corp. v. Entegris, Inc., 249 F.R.D. 48, 51 (E.D.N.Y. 2008) (quoting Barratt v. Joie, No. 96 Civ. 324, 2002 WL 335014, at *1 (S.D.N.Y. Mar. 4, 2002)).  "Furthermore, even in a de novo review of a party's specific objections, the Court ordinarily will not consider 'arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance.'"  Fairfield Financial Mortg. Group, Inc. v. Luca, No. 06 Civ. 5962, 2011 WL 3625589, at *2 (E.D.N.Y. Aug. 16, 2011).

**B. Legal Standard for a Preliminary Injunction**

"A [party] seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  New York Progress and Protection PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013) (quoting Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)); see also Golden Krust Patties, Inc. v. Bullock, 957 F. Supp. 2d 186, 192 (E.D.N.Y. 2013) (same).  A preliminary injunction is considered an "extraordinary" remedy that should not be granted as a routine matter.  Johnson v. Burge, 506 F. App'x 10, 11 (2d Cir. 2012); see also JSG Trading Corp. v. Tray–Wrap, Inc., 917 F.2d 75, 80 (2d Cir.1990).

Generally, the purpose of a preliminary injunction is to preserve the status of the parties until a determination on the merits of the [movant's] claims can be made. Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 1834, 68 L. Ed. 2d 175 (1981). However, where a preliminary injunction is sought to change the status quo, rather than to preserve the status quo, the movant is held to a higher standard of proof. See, e.g., Bronx Household of Faith v. Board of Educ. of City of New York, 331 F.3d 342, 349 (2d Cir. 2003). In this regard, "[a] [party] who seeks a preliminary injunction that will alter the status quo must demonstrate a 'substantial' likelihood of success on the merits." Walsh, 733 F.3d at 486 (citing Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir.2004)). Ultimately, the decision to grant or deny this "drastic" remedy rests in the district court's sound discretion. See American Exp. Financial Advisors Inc. v. Thorley, 147 F.3d 229, 231 (2d Cir. 1998).

## C. As to the Plaintiffs' Objections to the R&R

### 1. As to Whether the R&R Applied the Correct Standard of Proof and Properly Applied the Polaroid Factors

The Plaintiffs first object to the R&R on the grounds that the wrong standard of proof was applied. In this regard, the R&R examined the Defendants' motion for a preliminary injunction under the normal standard of proof requiring that "[a] party seeking preliminary injunctive relief [ ] demonstrate . . . a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trail, with a balance of hardships tipping decidedly in the [moving party's] favor[.]" (R&R, pg. 8, quoting Red Earth LLC v. United States, 657 F.3d 138, 143 (2d Cir. 2011)). However, the Plaintiffs contend, and the Court agrees, that the R&R should have applied a higher standard of proof, because the Defendants are seeking to change the status quo instead of preserve it in that they seek to enjoin the Plaintiffs from selling those Apache II guitars that allegedly infringe on the Phantom word mark and Phantom

Body Shape mark.  In such cases, as stated above, a party "must demonstrate a 'substantial' likelihood of success on the merits."  Walsh, 733 F.3d at 486 (citing Sunward Elecs., Inc., 362 F.3d at 24).  Nevertheless, this error is not fatal to the R&R's ultimate recommendation concerning the Defendants' phantom marks.  This is because, as discussed below, the R&R's findings ultimately establish that the Defendants' have a substantial likelihood of succeeding on the merits of their claims.

Specifically, the R&R evaluated the elements of a trademark claim in the context of the Phantom marks.  With respect to the first element—that is, whether the Defendants' Phantom word mark and Phantom Body Shape marks were valid marks entitled to protection, the R&R found that the Phantom word mark "as applied to a guitar is unequivocally arbitrary—i.e., a word that may readily be defined but has no application as part of a description of a stringed instrument."  (R&R, pg. 12.)  Similarly, the R&R concluded that the Phantom Body Shape mark "encompasses an inarguably unique body shape" which is "highly distinctive," particularly in comparison with "the iconic shape generally associated with an electric guitar."  (R&R, pg. 13.)

Moreover, as the Defendants note, "[r]egistered marks," such as the Phantom marks here, "are presumptively distinctive, although this can be overcome by showing that a registered mark is generic or is descriptive without secondary meaning."  Juicy Couture, Inc. v. Bella Int'l Ltd., 930 F. Supp. 2d 489, 499 (S.D.N.Y. 2013) (citing Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 11 (2d Cir.1976); Giggle, Inc. v. netFocal, Inc., 856 F. Supp. 2d 625, 629–30 (S.D.N.Y. 2012)).  As the findings of the R&R establish, the Plaintiffs have failed to make such a showing.  Accordingly, based on these reasons, the Court finds that the Defendants are likely to succeed on the first element of their trademark infringement claims regarding the Phantom marks, namely that they are valid marks entitled to protection.

As to the second element requiring that the Defendants show that the Plaintiffs' use of the Phantom marks is likely to cause confusion, the Court finds that the R&R's analysis of the Polaroid factors as applied to the Phantom marks persuasively demonstrates that the Defendants are substantially likely to succeed in proving this element, as well. The Court notes that while the Plaintiffs raise a separate objection to the R&R based on their contention that the R&R misapplied the relevant test and evidence as to the Polaroid factors, the Court finds it more appropriate to consider the R&R's application of the Polaroid factors here.

In this regard, as outlined above, when analyzing the likelihood of confusion prong of a trademark infringement claim, courts consider the Polaroid factors, which, again, are as follows:

> (1) the strength of the [party's] mark; (2) the similarity of the marks; (3) the competitive proximity of the products in the marketplace; (4) the likelihood that the senior user will "bridge the gap" by moving into the junior's product market; (5) evidence of actual confusion; (6) the junior user's bad faith in adopting the mark; (7) the respective quality of the products; and (8) the sophistication of the consumers in the relevant market.

Juicy Couture, 930 F. Supp. 2d, at 498 (citing Polaroid, 287 F. 2d at 495). However, "[t]he Polaroid test 'is not a mechanical process where the party with the greatest number of factors weighing in its factor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused.'" deVere Grp. GmbH v. Opinion Corp., 877 F. Supp. 2d 67, 71 (E.D.N.Y. 2012) (quoting Nabisco, Inc. v. Warner–Lambert Co., 220 F.3d 43, 46 (2d Cir. 2000)).

Here, the R&R thoroughly considered each of the Polaroid factors. With respect to the strength of the Defendants' Phantom marks, the R&R concluded that they "are highly distinctive, and thus the strength of these marks weigh heavily in [the] [D]efendants' favor." (R&R, pg. 18.) In reaching this conclusion, the R&R pointed out that (1) the Defendants' Phantom marks are

registered trademarks; (2) the original 1960s guitars were only produced for approximately six years before being abandoned for decades; and (3) for more than twenty years, since 1993, the Defendants had used the Phantom marks in commerce.

The Plaintiffs challenge this finding on the basis that the R&R's distinctiveness analysis incorrectly relied on the case of Paddington Corp. v. Attiki Importers & Distributors, Inc., 996 F.2d 577, 583 (2d Cir. 1993), and its ruling that "the five-metric continuum for evaluating trademarks first defined by Judge Friendly in Abercrombie applies equally to trade dress." (R&R, pg. 12.). Specifically, the Plaintiffs argue that "the Supreme Court held in Wal-Mart Stores, Inc. v. Samara Brothers, Inc., 529 U.S. 205[, 120 S. Ct. 1339, 146 L. Ed. 2d 182] (2000), that product design could never be inherently distinctive." (Pls. Obj., pg. 24.) The Plaintiffs also contend that the R&R failed to consider the commercial strength of the Phantom marks.

The Court pauses here to observe that "[t]rade dress 'originally included only the packaging, or "dressing," of a product,' but it ha[d] been expanded [by many courts prior to Samara Brothers] to encompass . . . the design or configuration of the product itself;" such as the Phantom Body Shape mark at issue in this case. Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 114 (2d Cir. 2001) (quoting Samara Brothers, Inc., 529 U.S. at 209). However, in Samara Brothers, the Supreme Court held that "in an action for infringement of unregistered trade dress under 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectable, only upon a showing of secondary meaning." 529 U.S. at 216.

In this case, the Court notes that the trade dress in dispute—that is, the Phantom Body Shape mark—is a registered mark instead of an unregistered trade dress like that which was at issue in Samara Brothers. "[W]here marks have been registered as trademarks, as here, such registration is prima facie evidence that the mark is registered and valid (i.e., protectable), that

the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce . . . . In order to rebut the presumption of validity, the allegedly infringing party must show, by a preponderance of the evidence, that the mark is ineligible for protection." Audemars Piguet Holding S.A. v. Swiss Watch Int'l, Inc., (citations and internal quotation marks and alterations omitted); see also Guishan, Inc. v. Faith Ice, Inc., 08-CV-2407 DLI RML, 2010 WL 1223574, at *2 (E.D.N.Y. Mar. 22, 2010). ("Mister Softee's trade dress mark is strong-it is registered with the Patent & Trademark Office and has been in use since 1956."). For this reason, the Plaintiffs' reliance on L & J.G. Stickley, Inc. v. Canal Dover Furniture Co., 79 F.3d 258, 265 (2d Cir. 1996), is inapposite, since that case involved an unregistered trade dress instead of a registered trade dress like the Phantom Body Shape mark here in question.

Moreover, as the R&R highlights, the Phantom guitar's design protected by the Phantom Body Shape mark uses "an inarguably unique body shape" that differs greatly from the generic shape associated with electric guitars and serves no functional purpose. Of relevance here, "because [the Defendants] registered the [Phantom Body Shape mark], the burden falls to [the Plaintiffs] to prove functionality." Montblanc-Simplo GmbH v. Colibri Corp., 692 F. Supp. 2d 245, 256 (E.D.N.Y. 2010) (citing TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 29–30, 121 S. Ct. 1255, 149 L. Ed. 2d 164 (2001)). The Plaintiffs have failed to do so.

As to the second Polaroid factor concerning the similarity of the marks, the R&R relied on the illustrations of the Defendants' Phantom guitars and the Plaintiffs' Apache II guitars and determined that "there is no question as to the similarity of the designs," since both the Defendants' Phantom guitars and the Plaintiffs' Apache II guitars "vividly differ from conventional electric and acoustic instruments" while "their resemblance to each is striking." (R&R, pg. 19.) The R&R also notes that the Plaintiffs have used the Phantom word mark in

their advertisements for the Apache II guitars. Accordingly, the R&R states that "the trade dress and word marks used by [the Plaintiffs] in connection with the [Apache II guitars] are highly similar, and thus this factors weighs heavily in favor of [the Defendants]." (R&R, pg. 21.)

Concerning the proximity of the products, bridging the gap and the sophistication of the consumers, the R&R considered these factors together. First, the R&R found that "proximity weights heavily in favor of the [Defendants]" because "both parties produce electric guitars with a price point . . . in the hundreds of dollars and "are marketing these items to the very same consumers—individuals interested in purchasing an electric guitar." (R&R, pg. 23.) Second, the R&R determined the sophistication of the consumers factor to be a neutral one, since, on the one hand, the products offered by the parties are "not the kind of item . . . that purchasers acquire on a whim," while, on the other hand, "a sophisticated retailer has [nevertheless], in its advertising, apparently confused the source of these products, attributing [the Defendants' Phantom word mark] to [the Plaintiffs]." (R&R, pg. 23.) Third, the R&R noted that the "bridging the gap" factor was "irrelevant" because "the two products are in direct competition with each other" or else weighed in favor of the Defendants, in that the Defendants could easily seek to branch out and sell guitars to the customers to whom the Plaintiffs market the Apache II guitars. (R&R, pg. 24, quoting Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 115 (2d Cir. 2009)).

In addition, the R&R found that the actual consumer confusion factor "weighs somewhat in favor [the Defendants]," based on the evidence submitted by the Defendants indicating that following the introduction of the Plaintiffs' Apache II guitars, the Defendants were contacted by consumers who had purchased Apache II guitars who had apparently assumed that the Defendants, rather than the Plaintiffs, produced them. For the evidence of bad faith factor, the R&R disregarded it on the grounds that "neither good faith nor bad faith [had] been established

as to [the Plaintiffs] on [the] record[.]" (R&R, pg. 25.) Also, with regard to the respective

quality of the products factor," the R&R stated "the issue of quality also weights in favor of [the

Defendants]" since "the evidence submitted" indicated "that [the Defendants' Phantom guitars]

are manufactured to a higher standard of excellence than the Apache [II] guitars. Though the

latter include some electronic features, which may appeal to more casual play." (R&R, pg. 26.)

In the Court's view, the comprehensive reasoning presented in the R&R is sound and

more than sufficient to support a finding that the Defendants' have a substantial likelihood of

succeeding on the merits of their Counterclaim in connection with their claims pertaining to the

Phantom marks. As the R&R emphasizes, the preliminary injunction record demonstrates that

(1) the Phantom marks have significant strength; (2) the Plaintiffs' Apache II guitars are similar

in design to the Defendants' Phantom guitars; (3) the Plaintiffs have used the Phantom word

mark in connection with their advertisement for the Apache II guitar; (4) the Defendants' and the

Plaintiffs' products share close marketplace proximity; and (5) there is some evidence of actual

confusion among customers concerning whether the Plaintiffs or the Defendants manufactured

and sold the Apache II guitars. Accordingly, the Court declines to sustain the Plaintiffs'

objections to the R&R on the grounds that the R&R applied the incorrect standard of proof and

misapplied the Polaroid factors.

### 2. As to Whether the R&R Failed to Properly Address the Plaintiffs' Three Defenses

The Plaintiffs also object to the R&R on the ground that it did not adequately address

their three defenses of priority, fair use and laches when exploring the Defendants' likelihood of

success on the merits on their Counterclaim. At the outset, for the reasons articulated above in

the motion to dismiss portion of this Decision, the Court finds that the Plaintiffs' defense of

laches is without merit. Indeed, the evidence presented by the preliminary injunction record

substantiates the factual allegations in the Counterclaim stating that the Defendants successfully policed their marks in 1998 and 2007 and engaged in negotiations with the Plaintiffs concerning the 2012 Apache instruments starting in 2012. As such, the Court will now proceed to consider the Plaintiffs' remaining two defenses.

First, the Plaintiffs argue that the Defendants cannot prove priority regarding the Phantom Body Shape mark. In this regard, the Plaintiffs assert that "[f]or marks that are not inherently distinctive, it is well-settled law that a senior user's mark must have achieved secondary meaning before the junior user's first use in order to bring an infringement claim." (Pls. Obj., pg. 12.) The Plaintiffs then contend, as explained previously, that because the Phantom Body Shape mark concerns a product design, it is not, as a matter of law, inherently distinctive under the Supreme Court's decision in <u>Samara Brothers, Inc.</u>, 529 U.S. at 209.

Thus, according to the Plaintiffs, the Defendants must demonstrate that the Phantom Body Shape mark acquired its distinctiveness prior to the Plaintiffs' use of the same design. The Plaintiffs allege that the Defendants have failed to do so, because the Phantom Body Shape mark did not acquire distinctiveness until September 9, 2002, when the Defendants submitted an affidavit to the USPTO stating that it had acquired distinctiveness, but the Plaintiffs had used a similar design prior to that date when manufacturing the 1998 guitars.

However, under 15 U.S.C. § 1115(b)(5), a defense of priority only arises where the allegedly infringing party "show[s] that [it] was a prior user of the mark in the United States and *that its use of the mark was 'continuous and uninterrupted' from a date prior to [the non-infringing party's] registration to the present."* <u>Haggar Int'l Corp.</u>, 906 F. Supp. 2d at 130 (citations omitted) (emphasis added). Clearly, the Plaintiffs cannot establish the second element of this defense, since the Plaintiffs' use of the Phantom Body Shape design was clearly not

continuous from a date prior to the Defendants' registration of the Phantom Body Shape mark until the present. Instead, the Plaintiffs use was sporadic, in that they produced guitars using this design intermittently, first in 1998, then in 2007 and finally in 2012. In addition, the Court notes that, for the reasons already articulated by the Court, the Plaintiffs' reliance on <u>Samara Brothers, Inc.</u> is misguided, since the Phantom Body Shape mark is a registered trade dress.

As to the Plaintiffs' alleged defense of fair use, the Court is once more not persuaded. "In order to assert a successful fair use defense to a trademark infringement claim, the [allegedly infringing party] must prove three elements: that the use was made (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith." <u>Kelly-Brown</u>, 717 F.3d at 308 (<u>citing</u> 15 U.S.C. § 1115(b)(4); <u>EMI Catalogue P'ship v. Hill Holiday Connors, Cosmopulos Inc.</u>, 228 F.3d 56, 64 (2d Cir. 2000)). Here, the Plaintiffs contend that their use of the Defendants' Phantom word mark is protected by fair use, since they are using the term in a descriptive sense to refer to the historical original guitars from the 1960s.

However, the Court agrees with the R&R's analysis that despite the Plaintiffs' claims to the contrary, the Plaintiffs use of the Phantom word mark in advertising for the Apache II guitars appears to go beyond just discussing the historical origins of the instrument, since the marketing capitalizes the Phantom word mark, suggesting a brand name. Moreover, at least one retail website selling the Apache II guitars referred to the item as a "Vox Phantom Guitar" and did not even mention the Apache trade name. (R&R, pg. 20–21.) In fact, even in its own marketing of the Apache II guitars, the Plaintiffs acknowledged that the Phantom word mark is owned by the Defendants, further indicating that the Plaintiffs recognized that the Phantom word mark has significance outside of a descriptive, historical use but nevertheless went ahead and used it in the promotion of its Apache II guitars.

In sum, none of the Plaintiffs' defenses undermine the finding that the Defendants' have established a substantial likelihood of success on the merits on their Counterclaim concerning the Phantom marks. Therefore, the Court declines to reject the R&R based on this objection.

### 3. Whether the R&R Properly Considered the Plaintiffs' Argument Concerning the Defendants Alleged Undue Delay in Bringing their Motion for a Preliminary Injunction

Finally, the Plaintiffs claim that the R&R failed to properly consider the Defendants purported delay in bringing their motion for preliminary injunction, which would undercut a finding of irreparable harm. In this regard, similar to their laches argument, the Plaintiffs assert that the Defendants were on notice since 1998 that the Plaintiffs were allegedly infringing on the Defendants Phantom marks, but nevertheless took no action until after the Plaintiffs initiated the present lawsuit.

However, as the Court explained in its laches analysis, the Defendants sent cease and desist letters in 1998 and 2007 to the Plaintiffs, which resulted in the Plaintiffs ceasing production of the allegedly infringing instruments. Accordingly, at that juncture, there would have been no reason for the Defendants to initiate litigation against the Plaintiffs in order to acquire preliminary injunctive relief. Furthermore, with respect to the 2012 Apache instruments, the Defendants also sent a cease and desist letter to the Plaintiffs as well as engaged in negotiations with the Plaintiffs about their use of the Phantom marks. These negotiations lasted to just prior to the commencement of this action by the Plaintiffs. Shortly thereafter, the Defendants filed their Counterclaim and brought the motion for a preliminary injunction. In the Court's view, based on these facts, there was no undue delay by the Plaintiffs.

Of importance, although "[d]elay generally destroys the presumption of irreparable harm that follows a showing of likelihood of confusion in a trademark case[,] . . . the presumption

remains in cases where the [non-infringing party] was unaware of its rights or was actively pursuing its rights." Kuklachev v. Gelfman, 629 F. Supp. 2d 236, 250 (E.D.N.Y. 2008), aff'd, 361 F. App'x 161 (2d Cir. 2009) (citation omitted) (collecting cases). Based on the actions of the Defendants as described above, it is clear that the Defendants were actively pursuing their rights by sending cease and desist letters and by attempting to negotiate with the Plaintiffs regarding the Phantom marks.

## V. CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that the Plaintiffs' motion to dismiss the Defendants' Counterclaim pursuant to Fed. R. Civ. P. 12(b)(6) is denied; and it is further

**ORDERED**, that the Plaintiffs' motion to supplement the preliminary injunction record is denied; and it is further

**ORDERED**, that the Plaintiffs' objections to Judge Brown's Report and Recommendation are overruled, and it is further

**ORDERED**, the Court adopts Judge Brown s' Report and Recommendation in its entirety and adopts Judge Brown's recommendation that the Defendants' motion for a preliminary injunction be (1) granted as to the Defendants' Phantom word mark and Phantom Body Shape mark as applied to electric guitars; (2) denied as to the Defendants' Teardrop word mark and Teardrop Body Shape mark as applied to electric guitars; and (3) denied as to any claim regarding the Plaintiffs' production of electric ukuleles; and it is further

**ORDERED**, that the Defendants are directed to file a $50,000 bond as a condition of the preliminary injunction; and it is further

**ORDERED**, that the Clerk of the Court is directed to terminate Docket Numbers 11, 23,

30, 37 and 40.

**SO ORDERED.**
Dated: Central Islip, New York
September 29, 2014

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge